We'll move to the last case of the day, Palmer v. Franz. And, uh, Mr. Chinsky. Andrew Chinsky All right, go ahead. Andrew Chinsky Thank you, Your Honors. My name is Andrew Chinsky. I represent the appellant, Leroy Palmer, and may it please the Court. A reasonable jury could find that Mr. Leroy Palmer suffered a cruel and unusual punishment when the defendant, a licensed and professionally trained registered nurse, failed to do anything to provide Mr. Palmer, who was missing his left hand, with a low bunk permit that a doctor had already prescribed. Specifically, a jury could find the defendant knew of and disregarded a substantial risk of harm, satisfying the two components of the deliberate indifference test under the Eighth Amendment. And this morning, I would like to focus on this deliberate indifference component of Mr. Palmer's claim. And first, I will highlight why a jury could find the defendant knew of a risk of harm to Mr. Palmer, where a defendant indisputably knew that he was missing his left hand and that a doctor had already prescribed the permit. Second, I will show why a jury could also find the defendant disregarded that risk of harm to Mr. Palmer by failing to do anything in the face of this known and obvious need. First, the undisputed facts in this case provide strong evidence that the defendant knew of a risk of harm to Mr. Palmer. Now, we acknowledge, as this Court has often acknowledged, that it can be difficult in cases such as this to find direct evidence of actual knowledge of harm. However, as this Court has said in cases such as the State of Simpson, knowledge may be inferred based on the obvious condition of the risk. In a similar circumstance in Haley v. Gross, the Court noted that the jury can infer knowledge based on the conspicuous nature of a risk. The full recounting of Mr. Palmer's transfer screening with defendant is set forth in our briefs. But as he was transferred from the Shawnee Correctional Center to the Stateville Northern Reception Center, which I may refer to as the NRC, I'd like to highlight a few important facts for the Court. First, a doctor at Shawnee had already prescribed a permit of indefinite duration for my client. Second, this was noted on Mr. Palmer's transfer screening form as he went into the NRC, and he also told defendant that he had and needed the permit at the NRC. Based on Mr. Palmer's verbal communications with defendant, as well as the clear notation on the form, it should be undisputed that defendant knew that he had the permit and had this obvious need. So, quick question. The form also includes a low gallery and slow eating pass. Do we know whether those were honored in the transfer to the NRC? Your Honor, I'm not sure that's in the record. And so, in looking at that form, what tells the defendant that there is definitely or probably a doctor's order for the low bunk? So, the notation low bunk, low gallery permit is, in our view, sort of self-describing. It's a very specific notation. Right. Could it come from anybody other than a doctor? The defendant actually has suggested that it could have come from a nurse practitioner or a physician's assistant. Anybody other than a medical provider? No, it could not. This is a medical permit. Forgive me, but does the record indicate how high the upper bunk is? It does not, Your Honor. Other cases have noted that it could be slightly elevated. It was apparently high enough for when he fell and smashed his knee for a piece of bone to break off, at least according to our medical experts. That could be four feet. Sorry, Your Honor? That could be four feet or three feet. It could be four feet, but in our view, that would still pose a risk of harm to someone who would fall. Just being in jail is a risk of harm. That is true, although the Eighth Amendment does provide protections for people who are in prison who cannot, by reason of that deprivation of their liberty, care for themselves. So, getting back, unless there are other questions, getting back to this transfer screening, it lasted at least ten minutes. This is an undisputed fact. This was well enough time for a defendant to have acted on this obvious and clear need. At this time, the defendant was also the only medical person who was examining Mr. Palmer. This was his responsibility at this point, as the nurse, working for the prison's medical provider, to see him and make sure that he was— This was Wexford? Correct. This was Wexford. So, the nurse at the time was employed by Wexford. But instead of doing anything to get him that care, the nurse simply checked routine care on the bottom of the form, which, as I'll explain in a moment, accomplished nothing to actually get Mr. Palmer the care he needed. Second, in addition to the fact that a jury could find the defendant knew of the risk of harm, a reasonable jury could also find that the defendant failed to act in the face of this risk by ignoring as many available options to help Mr. Palmer. And as we talk about the second part, I ask the court to keep in mind two things. First, deliberate indifference does not require that the defendant intended for or hoped for or desired the ultimate harm that transpired. It merely requires that the defendant knew of and disregarded a substantial risk of harm. Even if the act is not malicious, that's not part of the standard. Second, as I mentioned, the defendant is a registered nurse. He was not, for instance, the prison janitor or cafeteria worker. He was a professional working for the prison's medical provider and had been trained to provide medical care for patients. Even a nurse's scope of practice under the Illinois statute includes things like the prevention of illness and injury. The defendant at this point was the single point of contact between Mr. Palmer and Wexford and potential future care. How could it be that the nurse then was not required to get Mr. Palmer the care that he required? So what's the clearest indication that Nurse France had the power and the duty either to issue this new low bunk permit or to have somebody else with more authority review it promptly? So there has never been any suggestion in this case that a defendant was prevented from calling a doctor or calling the medical director, even if he didn't think he could issue the permit himself. We disagree with the defendant's account and believe that he could have at the very least issued what we term a bridge order. I'm asking you, are you talking about Duffield's testimony? Correct. Okay. Duffield, she was a 30B6 deponent? Yes, she was. Is that right? And can you sort out the confusion about the timing for her? She says she comes in in 2015. Palmer got hurt back in 2012, right? That's correct. So Ms. Duffield had worked for the Illinois Department of Corrections for years before. We subpoenaed IDOC asking for a witness to testify about the transfer screening process back in January of 2012, and this is who IDOC produced. We also asked Ms. Duffield, because we know that she said that there could be differences, but to her understanding, there weren't any differences between 2012 and 2015. There's no affirmative evidence of such differences? Correct. Thank you. Yes. Can I ask you quickly one question in essence? One of the odd facts here in essence is the injury doesn't come until 10 days later. So I'm asking myself, suppose it's six months later, suppose it's the first night he's there. Should any of that make a difference to us? I don't think so. All we know, the defendant saw Mr. Palmer for these 10 minutes and not further, but in that 10 minutes, that was when the defendant had the power to act, to do something to make sure my client wasn't given a low bunk, or was given a low bunk. And so the violation occurred actually at that point. I see him into my rebuttal time. I'd like to reserve unless there are further questions. Okay. Thank you. Ms. Hall? Good morning, Your Honor. My name is Jamie Hall. I represent the defendant, Nurse Craig P. Franz. Counsel, I'm a very old man. Would you raise your voice? Yes, I can. Sorry. May it please the court. Is this good, Your Honor? As you're aware, there are two necessary prongs of Mr. Palmer's constitution claim, an objectively serious medical condition, and then a subjective deliberate indifference. I'm going to begin with the dispositive subjective component of his claim. I was planning on doing so, but also because the appellant spent most of his time on that portion of the claim as well. With respect to the deliberate indifference claim, according to this court's decision of Pettis v. Carter, a plaintiff must provide evidence that an official actually knew of and disregarded a substantial risk of harm. Here, Nurse Franz lacked a subjective notice of an excessive risk of harm to Mr. Palmer. Mr. Palmer's entire argument against my client as how to implement accommodations for transfers, such as the low bunk order, without the delay of scheduling a new physician appointment. I'm sorry, Your Honor, I didn't hear your entire question. Oh, what I asked was if the prison had no policy as to how to implement accommodations for transfers without, you know, this delay of scheduling a new appointment with a physician, which can take a long time in prison. Yes, well, any inconsistency or any conflicting testimony in this regard or with regard to the IDOC or Wexford policies or procedures, those cannot be attributable to Nurse Franz here. We have the Gleason v. Indiana Department of Corrections case that a municipal or corporate entity may be liable even if none of its individual officers deprive a plaintiff of a constitutional right, so long as the institutional policies themselves give rise to the constitutional violations. So that might be something that could be argued against IDOC or Wexford, but not Nurse Franz. Counsel? Yeah, sorry. I don't think I'm getting an answer to my question. Oh, okay. Was there a policy as how to implement accommodations for transfers? There was conflicting testimony in the record by the IDC and Wexford representatives about this issue, Your Honor. There was not a definitive answer provided in the testimony by Nurse, by Ms. Duffield about it. And either by the Wexford representative, Mr. Fishman. Ms. Hall, let me ask. Nurse Franz gets the form. Yes. And it says on there, he knows that Mr. Palmer is missing his left hand. He knows also that he's coming in with a low bunk, low gallery, slow eating set of orders, right? That's what it says on the top of the form, correct. Right. So why isn't that reasonable notice to Nurse Franz that there's a medical reason for those rules, for those passes? He knows that that is a medical permit, low bunk permit that was issued at the previous facility at Shawnee. So that's why he wrote at the bottom of the form, see above. But Nurse Franz doesn't have the ability there at Statesville then to issue the low bunk permit again. Well, that's subject to some controversy in light of Duffield's testimony, it seems to me. But it seems to me more fundamentally. Our cases have repeatedly held that when a doctor has prescribed medications or treatments or special provisions for prisoners for medical reasons, it can be an Eighth Amendment violation for others to refuse to comply with those instructions or to interfere with the prescription medicine, right? Yes, there are cases where medications... Why is this different? This is different... Since he's got a doctor's order, he's got a condition that's obvious, and he does nothing about it. This is different because in those types of situations involving the medications and that the individual that is treating the prisoner has the authority at that time to do what the prisoner is asking. If it's a doctor or it's a nurse, they're in the health care unit at that point, and that health care nurse in the health care unit is able to either prescribe medicine or to have a doctor there get medicines that are necessary to treat the prisoner. Nurse Franz here is an intake nurse, and as the intake nurse, he has a limited set of responsibilities. The testimony that was provided here... I'm sorry. How is his action or inaction here any different from effectively deciding to cancel the Shawnee doctor's order? Because Duffield's testimony, while it was confusing in many aspects, was not confusing on whether or not he had the authority to issue a medical permit here. She was very clear, as well as Ms. Garcia's testimony, because it's a state licensure issue, not a Wexford or IDOC policy, that only licensed individuals in the medical profession are able to issue this type of low-bonk permit, and that is a certain prescribed group of individuals which do not include registered nurses, which is what Nurse Franz is. If it's a current order, they wouldn't have to call the physician because it's a current order. That's Duffield's testimony. He's got a current order, an indefinite order from a doctor at Shawnee for a low-bonk. No. Ms. Duffield did not testify to that because later she clarified her testimony that she was not speaking about this type of low-bonk order. What was she talking about? She was discussing other types of orders that were within the prison system. They were clarified. That was an answer to a question, and that's the same process that would be followed if the inmate had a low-bonk, low-gallery permit and the nurse thought it was warranted that the inmate get the pass currently. But then you would know if it's a current order, they wouldn't have to call the physician because it's a current order. She's being asked about low-bonks. Yes. And then she clarified later that she was talking about and that's in an urgent medical situation. And then she then later clarified on page 70, page, let's see. I think it might have been, I don't know if it's doc 191, page 3-7, or doc 177, 12-13, I had it in my brief, that when she was last asked later to clarify her testimony about what the screening nurse could do, she testified that they could only take steps to have the appropriate medical personnel issue the Statesville permit in light of the Shawnee permit. So later on she did clarify that testimony, that only a licensed medical provider could issue such permits. Well, the way the testimony came out, it does seem to give some support to the plaintiff's argument that we need to interpret ambiguities and uncertainties in favor of the non-moving party. I don't think that that's the case in this situation because when you read it in its entirety, I don't think it's ambiguous. I think when you read her testimony in its entirety, what's important here is whether or not he had the authority to issue the medical permit. And under the state licensure, not the DIOC's rules and not Wexford's rules, he did not have the authority to issue it here. Maybe I missed this, but you need a state license to say that somebody should sleep in a low bunk? No, you have to have the license ability to diagnose in order to issue that type of permit. For a low bunk in prison? Yes, for a low bunk in prison. Where is that in the state licensure rules? Is that in the briefs? I don't think it's in the briefs, but it's in the testimony by the various people, and it's not disputed by their testimony that that's the case. And that was Nurse Franz's belief as well. Would Nurse Franz have had authority to cancel a doctor's order? No, he would not have. Not as a registered nurse, no. But isn't that in effect what he was doing? No, he was not. I'm sorry, Your Honor. By doing nothing, the order was literally canceled. It was not because... It was canceled by his doing nothing. It was not canceled because... But that's the actual effect. Well, what he did was, the only thing that he had the authority to do in the circumstances was he marked the box for the ordinary sick call process. And what that is is then what Mr. Palmer understood it to mean, and what he pursued was then to go through the ordinary sick call process to have the appointment with the doctor in order to get the permit reissued there at Statesville. Now, I understand it was Mr. Palmer's testimony that he then applied for those permits, applied to try to get an appointment with the doctor through the sick call process, and that didn't happen. But Nurse Franz was not aware of that. There's no testimony that he knew that that didn't happen. And Nurse Franz is not the one that is responsible for responding to those routine sick calls. It's correctional medical technicians. So it's all Wexford staff, right? It's all Wexford staff. Was that also true at Shawnee? I don't know about Shawnee, and I don't know how Shawnee handles the medical permits. At that time, okay. Yeah. All right. Yeah. Any final thoughts you want to add? I wanted to just briefly address Mr. Palmer's claim that he just needed to have the low bunk permit because that's an incorrect statement of the law. If you look at the State v. Miller case, they rejected that argument and said that it supposes that every federal employee is responsible on pain and damages for not implementing the decision of any other federal employee so that all the plaintiff needs to show is the existence of the low bunk order. And an Eighth Amendment violation requiring a showing of deliberate indifference does not supplant that framework. So Palmer cannot rely on that Shawnee medical permit to supplant his obligation to provide deliberate indifference to Nurse Franz. And then I also wanted, because you asked about an ambiguity with respect to Duffield's testimony, we're looking at a subjective standard here. And Nurse Franz testified that it was his belief that he didn't have the authority to issue the medical permit. So even if Ms. Duffy's testimony is correct, I don't think that that contradicts his testimony. And at best, it would show that he adhered to an incorrect belief as to his authority. And that wouldn't amount to subjective deliberate indifference under the standard that's been set. Mr. Palmer also goes on to assert that Nurse Franz was responsible for his high bunk assignment here. I think those are covered in your brief. Okay. Is there anything else you need to add? No, that's all I've got. All right. Thank you. Thank you. Mr. Chansky, I gave the defense a little extra time. Go ahead and make it three minutes, please. Thank you, Your Honor. I have just three points I'd like to raise with the court. First, I want to start where my opponent ended on the estate of Miller case. In that case, this court did uphold the grant of summary judgment against a plaintiff who alleged a need for a low bunk permit. But it was precisely because that plaintiff had sued the guard and the warden rather than a physician or a nurse. And the court noted it was the medical staff who was responsible for issuing the low bunk permit. Second, you asked a little bit about what policies were in place. And my opponent noted that the testimony had established that this was a licensing issue. To emphasize that point, we actually asked the Wexford corporate representative if there were written documentation on this. And the Wexford representative said that they had looked and they couldn't find any written policy on this issue. Further, if the defendant were actually confused about what his options were, he could have picked up the phone and called the supervisor or called the physician. And that's actually exactly what this court suggested in Berry v. Peterman that a nurse ought to do. There, a nurse was arguing that he didn't have authority to refer an inmate with a toothache to see a dentist. And the court said, no, that you have to do more. Third, on the policy point, we haven't touched yet on the July 2012 transfer screening where Mr. Palmer came back to Stateville. And the nurse who completed his transfer screening at that time actually wrote in the bottom portion of that form, low bunk permit given. That is indisputably different from what Nurse Brand said here. The final thing that I want to say is about the defendant's authority. This case, in some ways, is about his authority. But in other ways, it's about the fact that he was the only medical person who was there to see my client at the time that he was transferred. And the defendant testified that he knew sick hall, checking the box for sick hall, would accomplish nothing. That was simply Mr. Palmer's opportunity to pursue meeting a doctor at a later date. In sum, I would say that there are few medical conditions that are more obvious than a missing hand. And a jury, seeing Mr. Palmer's missing left hand, what defendant saw, and understanding that a doctor had already prescribed this permit, could reasonably find that defendant was deliberately indifferent to serious medical need. And if there are any other questions, I say thank you. I gather you all took this on court appointment. Yes, Your Honor. You and your firm have thanks to the court, to services to the court, and to your client. We also thank the defense counsel for the able representation of your client as well. And the court will be in recess.